**DESSERT SERVICE, INC., Plaintiff,**

v.

**M/V MSC JAMIE/RAFAELA, her engines, boilers, tackle, etc., Mediterranean Shipping Co. S.A., Jacinia Holdings, Inc., Partrederiet "MSC Jamie," Defendants.**

**No. 01 Civ. 1684(NRB).**

United States District Court, S.D. New York.

Aug. 14, 2002.

Harold M. Kingsley, Steven P. Calkins, Kingsley & Kingsley, Hicksville, New York, for Plaintiff.

Edward Philip Flood, Kirk M.H. Lyons, Lyons, Skoufalos, Proios & Flood, LLP, New York City, for Defendants.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiff Dessert Services, Inc. ("Dessert Services") brings this action against defendant Mediterranean Shipping Company, S.A. ("MSC"), claiming damages for a shipment of frozen desserts that thawed during carriage. As MSC has previously stipulated to liability, Dessert Services has moved for summary judgment against MSC on the issue of damages, arguing both that (1) damages should be measured by the sound market value of the goods at their intended time and place of arrival; and (2) the applicable pre-judgment interest rate is the New York statutory rate of nine percent. In its cross-motion,[1] MSC argues that damages should be measured by the replacement value and that the pre-judgment interest rate should be the average annual T-bill rate. MSC also alleges that plaintiff failed to mitigate its damages and thus, that there is a genuine issue of

---

1. While MSC titled its memorandum in connection with this motion as a "Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment," we believe MSC's intent was to cross-move, given its express position that "there are no genuine issues of material fact [with respect to the question of the applicable damages standard] and the issue is ripe for summary determination by the Court." Def.'s Opp. Mem. at 2.

material fact that prevents a grant of summary judgment on this issue. For the reasons set forth below, we find the proper measure of damages to be the replacement value and that the pre-judgment interest rate should be measured by the average annual T-bill rate. We further find that there is a genuine issue of material fact in dispute as to whether plaintiff mitigated its damages. Accordingly, plaintiff's motion is denied and defendant's cross-motion is granted.

## BACKGROUND

Plaintiff is the exclusive United States distributor of "Bindi" Italian frozen desserts. Telephonic Deposition of Michelangelo Pinto held on December 3, 2001, ("Pinto Dep.") at 10. These desserts are imported from Italy and are distributed by plaintiff in the United States to high-end restaurants, hotels, catering services, and entertainment centers. *Id.* at 8. Dessert Service's headquarters is located in Totowa, New Jersey. *Id.* at 19. Plaintiff also has a branch office in Gardena, California, where the damaged shipment at issue was received. Deposition of Emelia O'Brien held on June 29, 2001, ("O'Brien Dep.") at 7. The Gardena branch office has a refrigerated warehouse facility where the frozen desserts imported from "Bindi" are stored before they are sold in the retail market. Pinto Dep. at 22–24. By placing periodic orders to Bindi in Italy, the Gardena facility maintains a substantial inventory of frozen desserts. *Id.* at 14. When a shipment of newly imported frozen desserts arrives, the desserts are placed in frozen storage for 30 to 60 days before they are sold to customers. O'Brien Dep. at 13–14.

On July 20, 2000, plaintiff's Gardena branch office received a shipment of frozen desserts that had been shipped from Milano, Italy under defendant's bill of lading. Pinto Dep. at 27. Upon arrival of the shipment, Dessert Services determined that the frozen desserts inside the ship-ping container had thawed during carriage and decided to reject the shipment. *Id.* at 34. These goods were temporarily stored and reviewed by salvage experts, and then all the desserts were destroyed with the exception of a cookie item that did not require refrigeration. O'Brien Dep. at 20, 25.

One day later, or July 21, 2000, Gardena's branch manager, Michelangelo Pinto ("Pinto"), ordered a number of items of replacement frozen desserts from plaintiff's Totowa facility. Pinto Dep. at 48. Plaintiff's Totowa facility was able to immediately fill the entire order. *Id.* at 49. It took approximately five to seven days from the date of order for the replacement frozen desserts to be transported by truck from plaintiff's Totowa facility to plaintiff's Gardena facility. *Id.* at 46. Over the next two to four weeks, plaintiff's Gardena office placed additional replacement orders with its Totowa office, all of which were able to be completely filled and received five to seven days later. *Id.* at 52–54. Plaintiff was able to fill all of its customers' orders for "Bindi" frozen desserts due to the size of the existing inventory in plaintiff's Gardena facility and the replacement of frozen desserts provided by its Totowa facility. *Id.* at 32.

Defendant admits liability for plaintiff's loss but the parties disagree about the appropriate measure of damages. Plaintiff claims a loss of $97,211.00, representing the fair market value as calculated from plaintiff's Price List at the time of delivery. Defendant claims that Dessert Services' losses should be limited to $30,926.29, the product cost of the "Bindi" desserts. Defendant also argues that the salvage value of $6,056.19 for the frozen desserts should be deducted from the $30,926.29. The costs not in dispute are the storage cost ($915.00), the destruction cost of the desserts ($1,150.00), the survey fees ($1,227.50), and the cross-country

trucking fees incurred by shipping the frozen desserts from the Totowa, NJ office to the Gardena, CA office.[2] Defendant also concedes liability for the freight cost of $5,370.00 and the customs duties of $1,033.33. Thus, in sum, plaintiff claims a total loss of $100,503.50 [3] while defendant claims the loss should be limited to $40,622.12 [4] less the salvage value.

## DISCUSSION

### A. Summary Judgment Standard

A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence presented must be viewed in the light most favorable to the non-moving party such that all ambiguities and inferences drawn from the underlying facts must be resolved in favor of the non-moving party. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991). The moving party bears the burden of showing that no genuine factual dispute exists. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party satisfies this burden, the burden shifts to the non-moving party, who must go beyond its pleadings and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

### B. Standard for Measuring "Actual Loss"

The traditional measure of "actual loss" is the difference between the fair market value of the goods at the port of destination in their condition as shipped, and their value as damaged. *Chicago, M. & St. Paul Ry. Co. v. McCaull–Dinsomre Co.,* 253 U.S. 97, 100, 40 S.Ct. 504, 64 L.Ed. 801 (1920). The theory behind this general rule is that typically, to award only replacement costs would "deprive a [plaintiff] of expected profit which he is on the verge of earning and do[es] not compensate him for what he would have had if the contract had been performed." *Polaroid Corp. v. Schuster's Express, Inc.,* 484 F.2d 349, 351 (1st Cir.1973).

There is, however, an exception to this general rule whereby the replacement cost is deemed to be the appropriate measure of damages. *Illinois Cent. R.R. Co. v. Crail,* 281 U.S. 57, 64, 50 S.Ct. 180, 74 L.Ed. 699 (1930). "The test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means restored to if, for special reasons, it is not exact or otherwise not applicable." *Crail,* 281 U.S. at 64–65, 50 S.Ct. 180. In cases such as this, "[t]he burden of proof is on the carrier [ ] to show that 'special reasons' exist such that application of the market

---

**2.** Although liability for this expense is not in dispute, Dessert Services has not documented the exact amount of this expense.

**3.**

| | |
|---|---|
| Fair market value | $ 97,211.00 |
| Storage cost | $     915.00 |
| Disposal | $  1,150.00 |
| Survey fees | $  1,227.50 |
| | |
| Total | $100,503.50 |

**4.**

| | |
|---|---|
| Product cost | $ 30,926.29 * |
| Storage cost | $     915.00 |
| Disposal | $  1,150.00 |
| Survey fees | $  1,227.50 |
| Freight | $  5,370.00 |
| Customs duties | $  1,033.33 |
| | |
| Total | $ 40,622.12 |

* The cost of the entire shipment was $32,750.55. One type of item in the container (dry cookies) was not damaged. The product cost figure was obtained by subtracting the price of the dry cookies from the cost of the entire shipment.

value rule will not result in a just measure of actual damages." *Philips Consumer Elecs. Co. v. Arrow Carrier Corp.*, 785 F.Supp. 436, 441 (S.D.N.Y.1992); *see also Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317, 319 (10th Cir. 1991) (same). Courts have found that "special reasons" rendering the market value rule inapplicable exist when the shipper can replace the shipment at cost and suffers no loss of profit. *Philips*, 785 F.Supp. at 441. The rationale is that the shipper has received the profit and thus should not be accorded more than full compensation for the loss it sustained. *Id.*[5]

■ We find that MSC has met its burden of showing that special reasons exist that render the market rule inapplicable. *Id.* Defendant has shown that plaintiff replaced the shipment by substituting frozen desserts from the Totowa office and using its large existing inventory in the Gardena office. The Gardena office did not lose any sales and was able to fill all of its customers' orders for the frozen desserts. Further, as Pinto explained at his deposition, Dessert Services was able to restock its warehouses by ordering additional desserts in its next order from Bindi, and lost no subsequent sales. Plaintiff is not entitled to damages based on the market value because to award market value damages would result in a recovery greater than the actual loss suffered. *Id.* Rather, the appropriate measure is the replacement cost, which will place plaintiff in the same position as if the goods had not been damaged. *Crail*, 281 U.S. at 64, 50 S.Ct. 180. Accordingly, plaintiff's motion for summary

judgment on the issue of damages is denied and defendant's cross-motion is granted.

## C. Mitigation of Damages

Although the parties agree that the issue of how damages should be measured is ripe for summary judgment,[6] defendant argues that the question of mitigation raises a triable question of material fact. Dessert Services takes the position that the desserts were not salvageable. Since plaintiff did not retain a salvage expert, it bases this position on Pinto's inspection of the desserts and determination that simply re-freezing the thawed desserts containing ingredients such as dairy products and sugar would not have restored the flavor, texture or wholesomeness to the desserts. *See* Pinto Dep. at 34, 59–60. Dessert Services also claims that it did not attempt to sell the frozen desserts in the secondary market because the brand name "Bindi" appeared on all of the packaging, and plaintiff wanted to avoid tarnishing the "Bindi" brand's reputation with an appearance in the secondary market. *See id.* at 41.

Defendant's position is that the frozen desserts could have been salvaged and sold on the secondary market. Two marine surveyors, Captain Arun Jolly of Techno Marine Services on behalf of MSC and Vladek Marcinkowski on behalf of Dessert Services' cargo insurers, both inspected the shipment of frozen desserts and believed that the thawed desserts were wholesome and had a salvage value. *See* Declaration of Kirk M.H. Lyons dated March 8, 2002, ("Lyons Decl.") Exs. O and P. MSC also retained an experienced cargo

---

**5.** Defendant misreads the relevant law in relying on cases where the goods are stolen, as opposed to destroyed. In cases where goods are stolen, the exception is not applicable and the fair market value is awarded because the stolen goods "compete with the manufacturer and therefore, no true replacement is possi-

ble." *Philips*, 785 F.Supp. at 441 (quoting *Polaroid*, 484 F.2d at 351). In the instant case, because the frozen desserts were not stolen but rather destroyed, market competition did not occur.

**6.** *See* note 1, *supra.*

salvor, Thomas Adams ("Adams"), President of Nadell & Co., who reviewed this matter and concluded that there was likely a secondary market for the frozen desserts with a salvage value of about 20% based on the wholesale value of the goods. Declaration of Thomas Adams dated March 7, 2002, at ¶ 3. Adams also made the recommendation that plaintiff's concern with protecting the "Bindi" brand name could be addressed by a salvor's agreement that the damaged goods would be sold without the "Bindi" packaging. *Id.* ¶ 4.

█ While the cargo owner has a duty to mitigate damages, the burden to show failure to mitigate rests on the carrier. *Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 308 n. 9 (2d Cir. 1987); *C. Itoh & Co. (Am.), Inc., v. Hellenic Lines, Ltd.,* 470 F.Supp. 594, 599 & n. 19 (S.D.N.Y.1979) (collecting cases). Viewing the facts in a light most favorable to defendant, the non-moving party, we find that genuine issues of material fact exist as to whether there was any salvage value for the desserts. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Dessert Services relies only on the opinion of Gardena's branch manager Pinto in arguing that the desserts had no salvage value. In opposition, MSC draws on the conclusions of multiple salvage experts that there existed a salvage value. MSC has put forth sufficient evidence that the frozen desserts as damaged had some salvage value to defeat Dessert Services's motion. Therefore, plaintiff's motion for summary judgment on this point is denied.

### D. Prejudgment Interest

█ It is a well-established rule that " '[a]llowance of prejudgment interest in admiralty [actions] . . . should be granted in the absence of exceptional circumstances.' " *Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse,* 996 F.2d 506, 520 (2d Cir. 1993) (quoting *Mitsui & Co. v. Am. Exp.*

*Lines, Inc.,* 636 F.2d 807, 823 (2d Cir. 1981)) (alterations in original). The rate of pre-judgment interest is within the broad discretion of the district court. *Transatlantic Marine Claims Agency Inc. v. M/V "OOCL INSPIRATION",* 137 F.3d 94, 104 (2d Cir.1998); *Mentor,* 996 F.2d at 520. In determining the applicable rate of interest, this Circuit has held that " '[a] plaintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations.' " *Transatlantic,* 137 F.3d at 104 (quoting *Ingersoll,* 829 F.2d at 311).

█ Plaintiff claims that the pre-judgment interest rate should be measured by the New York nine percent statutory rate. N.Y. C.P.L.R. §§ 5001, 5004. We find, however, that the pre-judgment interest rate proposed by defendant, based on the average annual T-bill rate, would be more appropriate. The T-bill rate more closely parallels the income the damages would have earned in a short-term, risk-free investment. See *Transatlantic,* 137 F.3d at 104. Further, as I have noted in the past, while "some courts have adopted state interest rates in federal question cases, it seems to us more appropriate to use a constant federal rate rather than for the outcome to vary depending on where the federal court happens to sit." *Merchant v. Lymon,* 1995 WL 217508, at *7 (S.D.N.Y. Apr.11, 1995). Accordingly, the pre-judgment interest rate applicable to this action is the average annual T-bill rate.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted.

**IT IS SO ORDERED.**